IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

THERESE EZERSKI,

        Plaintiff,

        v.

KIRLINS, INC., LONG-TERM
DISABILITY PLAN, *et al.*,

        Defendants.

:

:

:

Case No. 3:17-cv-69

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD (DOC. #45); OVERRULING PLAINTIFF'S
CORRECTED MOTION FOR JUDGMENT ON THE ADMINISTRATIVE
RECORD (DOC. #46); JUDGMENT TO ENTER IN FAVOR OF
DEFENDANTS AND AGAINST PLAINTIFF; TERMINATION ENTRY

---

Plaintiff, Therese Ezerski, filed suit against Kirlins, Inc., Long-Term Disability

Plan, and Northwestern Mutual Life Insurance Company ("Northwestern"), under

the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1001 *et seq.,* seeking judicial review of Northwestern's termination of her long-

term disability benefits. All claims against Kirlins, Inc., Long-Term Disability Plan

have been voluntarily dismissed. This matter is currently before the Court on

Northwestern's Motion for Judgment on the Administrative Record, Doc. #45, and

Plaintiff's Corrected Motion for Judgment on the Administrative Record, Doc. #46.

## I.  Factual Background and Procedural History

Plaintiff, Therese Ezerski, was the manager of a Hallmark card and gift store owned by Kirlins, Inc.  One of her employee benefits was long-term disability insurance under a group policy issued by Northwestern Mutual Life Insurance Company.  The long-term disability plan ("the Plan") is governed by ERISA.  The Plan provides that, following a 90-day waiting period, an employee is entitled to long-term disability benefits for the first twenty-four months of disability if "Disabled from your Own Occupation."  An employee meets that requirement "if, as a result of Sickness, Injury or Pregnancy, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation."  Doc. #40-1, PageID#526.

After receiving long-term disability benefits for twenty-four months, an employee may continue to receive benefits only if he or she is "Disabled from all occupations."  An employee is considered "Disabled from all occupations if as a result of Sickness, Injury or Pregnancy, you are unable to perform with reasonable continuity the Material Duties of any gainful occupation for which you are reasonably fitted by education, training and experience."  *Id.*

Ezerski, who was born in 1963, became disabled on March 21, 2013.  On her application for disability benefits, she wrote that she had "arthritis, nerve problems in legs and feet.  I have a degenerative spinal condition and arthritis in my knees and carpal tunnel in arms.  I cannot stand, bend, climb, walk and count

money because of this."  She indicated that her condition had worsened over the past couple of years.  Doc. #40-3, PageID#1103.

At Northwestern's request, Dr. Mark Shih, who is board certified in physical medicine and rehabilitation, reviewed Ezerski's medical records from her pain management physician, Dr. Jeffrey Rogers.  Dr. Shih's September 4, 2013, report indicated that Ezerski had a "history of chronic low back pain with underlying [degenerative disc disease/degenerative joint disease] with possible subtle right L5 radiculopathy on EMG with focal neurologic deficits."  Although her neurologic examination was normal, she complained of low back pain radiating to her legs.  Dr. Shih concluded that, as a result of these conditions, Ezerski had reasonable limitations that would prevent her from performing her light-level job as the manager of a retail store.  Doc. #40-2, PageID#877.

Because Ezerski was unable to perform with reasonable continuity the material duties of her own occupation, Northwestern approved her application for long-term disability benefits, and paid her benefits from June 23, 2013, through June 22, 2015.  *Id.* at PageID##931-35.  Throughout that time, Ezerski continued to be treated for neck and back pain.  *Id.* at PageID##811, 816-17, 863, 866, 881.

After a change in insurance coverage in April of 2014, Ezerski discontinued treatment with Dr. Rogers, and instead sought treatment from her family doctor, Christopher Lauricella, D.O.  She asked him to complete a medical questionnaire in support of her disability claim, and he agreed that she was unable to work at that

time. *Id.* at PageID##850-51. Dr. Lauricella referred her to Michael Verdon, M.D., a neurosurgeon, for further evaluation. Dr. Verdon diagnosed Ezerski with cervical radiculopathy and sciatica. He recommended physical therapy, manipulation, pain management, and possible surgery. Doc. #40-1, PageID## 712-16, 721. On October 7, 2014, he also diagnosed her with cervical spondylosis, osteoarthritis and sacroiliitis. *Id.* at PageID#710.

On October 17, 2014, Dr. Shih reviewed Ezerski's updated medical records. He noted that she "presents now with a history of lumbar spondylosis with previously identified possible lumbar radiculopathy now with evidence of moderate to severe cervical spondylosis with stenosis and myelopathy with myelopathic signs on examination and cord deformity on myelogram." He further noted that Ezerski was awaiting surgery on her cervical spine "with additional complaints of upper extremity pain, numbness and tingling." Dr. Shih again concluded that "[h]er medical condition would reasonably preclude light-level work activities." He opined, however, that she would be reasonably capable of performing a sedentary job if she could alternate between sitting and standing as needed throughout the work day. Doc. #40-2, PageID##789-91.

On November 3, 2014, a vocational consultant, Josephine de Oliveira, completed a Transferable Skills Assessment and "any occupation" review, taking into account Ezerski's residual functional capacity. She identified several sedentary-level occupations for which Ezerski was qualified, including customer

service representative, appointment clerk, and receptionist. Doc. #40-3, PageID##1107-17.

On December 15, 2014, Dr. Verdon performed a successful anterior cervical disc fusion on Ezerski's neck. Doc. #40-1, PageID#689. A follow-up neurological exam on January 29, 2015, was normal. On that date, although Ezerski still reported some cervical discomfort, and tingling in both hands, she had full strength in all extremities, and had returned to her normal level of activity. She was cleared to lift up to 50 pounds. *Id.* at PageID##685-86.

When Dr. Lauricella treated Ezerski on February 26, 2015, for tennis elbow, he noted that she had a normal range of motion in her neck and shoulders. Doc. #40-1, PageID#643-44. At a follow-up visit with Dr. Verdon on March 12, 2015, she complained of choking episodes, lower back pain, neck pain, limited range of motion in her neck, and tingling in both hands. He noted that she still had local tenderness of her sacroiliac spine, and prescribed additional physical therapy. However, he found that she had full strength in her extremities and normal motor coordination. Doc. #40-4, PageID##1252-53. At a follow-up visit with Dr. Lauricella on April 7, 2015, for her elbow, she reported no back pain, and had normal range of motion and a normal musculoskeletal exam. Doc. #40-5, PageID##1413-15.

At the request of Northwestern, Dr. Shih reviewed Ezerski's file for a third time on April 15, 2015, including the updated records from Dr. Verdon and Dr. Lauricella. Dr. Shih acknowledged Ezerski's ongoing complaints of depression,

arthritis, and pain in her elbow and lower back. He noted, however, that, following surgery, Dr. Verdon had cleared her to lift up to 50 pounds. He concluded that, based on her medical records, "I would expect now she is capable of sedentary work activities on a full-time basis" and "ultimately may improve to potential light-level capacity." Doc. #40-1, PageID#633.

On April 20, 2015, the Social Security Administration denied Ezerski's claim for disability benefits. Doc. #40-3, PageID#1132.

On April 24, 2015, Northwestern informed Ezerski, in writing, that it would be terminating her long-term disability benefits effective June 22, 2015, because she was not "Disabled from all occupations." Northwestern cited the clinical findings of Dr. Verdon and Dr. Lauricella, Ezerski's x-rays, Dr. Shih's file review, and de Oliveira's Transferable Skills Assessment. *Id.* at PageID##1039-42.

On April 27, 2015, Ezerski called Northwestern to protest the termination of her disability benefits. She complained that she could not "use her hands, turn her head or walk, and can't drive." She noted that she was seeing Dr. Lauricella the following day, and promised to have him send a note saying that she is permanently disabled, *id.* at PageID#1038, but no such note was submitted.

Office notes from her April 28, 2015, visit with Dr. Lauricella indicate that she was there to follow up on lab work. She complained of back and neck pain and stiffness, arthralgias, elbow pain, intermittent leg pain, and decreased concentration. Doc. #40-5, PageID##1419-20. He noted decreased range of motion in Ezerski's cervical back and lumbar back, but otherwise the physical

6

examination was unremarkable. She had normal range of motion in her neck and thoracic back. *Id.* at PageID#1421.

On May 1, 2015, an MRI of Ezerski's lumbar spine showed "[n]o evidence of lumbar disc herniation or nerve root impingement," but it did show mild lumbar disc desiccation and bulging, and mild age-related facet arthropay. Doc. No. 40-4, PageID##1361-62. An electromyogram/nerve conduction study ("EMG/NCV") performed on June 3, 2015, by Pani Akuthota, M.D., showed no sign of lumbar radiculopathy or lumbosacral plexopathy, myopathy or motor neuron disease. Although Ezerski had a "possible borderline sensory neuropathy" in her calf muscle, Dr. Akuthota found that Ezerski had normal gait, normal strength, and intact sensation in both legs. *Id.* at PageID#1364.

Ezerski visited Dr. Lauricella again on June 10, 2015, to review those test results. She again complained of pain in her back, legs and joints, and of weakness, numbness and gait problems. Nevertheless, her physical examination showed normal range of motion, normal strength, no sensory deficit, normal gait and normal muscle tone. *Id.* at PageID##1313-14.

On June 11, 2015, Ezerski returned to Dr. Verdon, complaining of back pain. Although he diagnosed her with sacroiliitis, a depressive disorder and anxiety, his physical examination showed that she had full strength in each area tested, normal sensation and reflexes, a normal gait, normal posture, and a normal range of motion in her cervical, thoracic and lumbar spines. However, she did test positive on the right side on the straight leg raise, seated straight leg raise, well leg

raise, shopping cart sign and Faber/Patrick's tests. He noted that Ezerski had a self-reported Oswestry disability index score of 72%, meaning that, in her opinion, her back pain had "an impact on all aspects of daily living and work," placing her in the "crippled" category. He prescribed physical therapy and asked to see her again in six weeks. *Id.* at PageID##1250-52.

On June 15, 2015, at the request of Ezerski's attorney, physical therapist Rick Wickstrom conducted a Functional Capacity Evaluation ("FCE"). *Id.* at PageID##1225-44. Wickstrom noted that Ezerski took a long time to complete the intake paperwork because she had to give her writing hand a break. *Id.* at PageID#1225. She told him that she became short of breath after walking just half a block. She also reported a wide variety of recent physical problems, including chills, fatigue, trouble sleeping, easy bruising, ringing and pain in her right ear, nasal congestion, eye discharge, cough, depression, heartburn, nausea, vomiting, constipation, frequent urination, dizziness, numbness and tingling in her extremities, and pain in her neck, back, feet and fingers. *Id.* at PageID#1227. She rated her quality of life, mental health, physical health, functioning at home and sleep quality as "poor," and rated her job satisfaction as "very poor." Her self-reported Activities Daily Living score was "very low." *Id.* at PageID##1229-30.

Wickstrom noted that, during the evaluation, Ezerski became tearful multiple times and had a depressed affect. *Id.* at PageID#1230. After conducting a variety of tests, he gave her an Overall Performance Rating of "medium low." He noted that she was "cooperative and provided good effort on some exam tests that did

8

not significantly stress recent problem areas; however, problems reported and related physical limitations demonstrated were only partly substantiated by objective findings." Among his "specific performance concerns" were unusual or inconsistent symptoms, superficial or non-anatomic tenderness, inconsistent weakness or strength, unusual behaviors or overreaction, and increased baseline symptoms after the exam. *Id.* at PageID#1239.

Despite these testing irregularities, Wickstrom recommended that Ezerski be found permanently and totally disabled. His summary report was as follows:

> Ms. Ezerski was cooperative; however, she presented with a very depressed affect and was very emotionally labile throughout the exam. She demonstrated multiple pain behaviors and appeared to be generally overwhelmed by chronic pain affecting primarily her neck, head, and back. Her physical examination of the upper quarter was remarkable for decreased sensation in the right thumb, normal and symmetrical reflexes and severe loss of neck active range-of-motion that was reasonably consistent with her history of neurosurgery on 12/15/14 for C4-5, C5-6, C6-7 anterior cervical fusion with discectomy, decompression of spinal cord, and osteophytectomy. Her physical exam of the lower quarter was remarkable for loss of sensation on the outer border of the left foot, a functional scoliosis related to a shortened left leg, and moderate loss of lumbar spine mobility that is consistent with previous diagnostics that showed multilevel degenerative disc disease of the lumbar spine at L3-4, L4-5 and L5-S1 levels.

> Her prognosis is poor for return to her full range of previous duties as a retail manager at Kirlans [sic] Hallmark. She is extremely debilitated and would be unable to work on a sustained, full-time basis at any level of physical demands. Her poor physical functioning was likely impacted by co-existing mental health conditions that were not a primary focus for this physical exam. I don't believe that she will make any substantial functional improvement in physical therapy until her mental health is more stable. It is therefore recommended that she receive appropriate mental health care as the first priority. She is not likely to benefit

from her current program of physical therapy until she feels less
overwhelmed by chronic pain and other circumstances. She
should be encouraged to walk as tolerated and to participate as
tolerated in a simple program of group aquatic exercise.

*Id.* at PageID#1242.

Although Wickstrom's report contained a space for Dr. Lauricella's
concurring signature, Dr. Lauricella did not sign it. *Id.* More than three months
later, on October 1, 2015, just prior to submitting the appeal, the report was
reprinted for Dr. Verdon's signature, and Dr. Verdon signed it. *Id.* at
PageID#1244.

Ezerski returned to Dr. Lauricella on July 24, 2015. Again, although she
continued to complain of back pain, joint pain, a gait problem, weakness and
numbness, his office records indicate that her physical examination was normal.
Doc. #40-4, PageID#1319.

Ezerski's attorney also asked Mark Pinti, a rehabilitation consultant and
vocational specialist, to review Ezerski's records and render an opinion as to
Ezerski's ability to return to any substantial gainful work activity. Doc. #40-5,
PageID##1437-39. On September 2, 2015, Pinti summarily concurred with
Wickstrom, writing that Ezerski's "residual functional capabilities are below
sedentary level of exertion," rendering her "totally disabled" and unable to work
"at any level of exertion." *Id.* at PageID#1439. Pinti discounted Dr. Shih's
findings that Ezerski might be capable of performing sedentary work, noting that
Dr. Shih had not examined her and did not have the benefit of reviewing

Wickstrom's FCE. He also discounted Ms. de Oliveira's Transferable Skills Assessment, concluding that her opinion was invalid because it was based on the incorrect assumption that Ezerski was capable of performing sedentary work. *Id.* at PageID##1438-39.

On October 7, 2015, Ezerski appealed Northwestern's termination of long-term disability benefits. On appeal, she submitted Wickstrom's FCE containing Dr. Verdon's signature. Doc. #40-4, PageID##1225-44. She also submitted updated medical records from Dr. Verdon, *id.* at PageID##1247-1310, and Dr. Lauricella, Doc. #40-4, PageID#1311–Doc. #40-5, PageID#1425, x-rays dated January 29, 2015, Doc. #40-5, PageID##1427-33, and Mark Pinti's vocational opinion report, Doc. #40-5, PageID##1437-39.

On appeal, Northwestern asked Shirley Ingram, M.D., who is board-certified in rheumatology and internal medicine, to review Ezerski's file. In her October 27, 2015, report, Dr. Ingram noted that, although Ezerski had been diagnosed with cervical disc disease and spondylosis, there was no evidence of neurogenic impingement following her surgery. Ezerski was also diagnosed with lumbar spine age-expected spondylosis without neurogenic impingement, and with chronic low back pain and neck pain. Despite Ezerski's history of anxiety and depression, there was no evidence that it was severe enough to warrant evaluation or treatment by a mental health professional. Doc. #40-1, PageID#575.

Dr. Ingram rejected Wickstrom's conclusion that Ezerski was disabled. She found that Wickstrom's assessment was inconsistent not only with his *own*

documentation on the FCE, but also with the documented findings in Ezerski's medical records.  *Id.* at PageID#576.  Dr. Ingram pointed out Wickstrom's documented performance concerns, and numerous other inconsistencies on the tests that Wickstrom had performed.  In Dr. Ingram's opinion, the fact that Ezerski's heartrate increased from 72 beats per minute to just 90 beats per minute during the testing was inconsistent with the increased pain that Ezerski reported, and indicated that Ezerski had failed to give maximum effort.  *Id.* at PageID#569.

Dr. Ingram also noted that Wickstrom's conclusion that Ezerski had severely limited range of motion in her neck was contradicted by his own findings that she had almost normal range of motion of lateral rotation, only moderate decreased flexion and near full extension.  She found "no rationale for this discrepancy and his recommendations[,]" and concluded that the FCE "underscores the patient's lack of credibility regarding her complaints."  *Id.* at PageID#570.

Dr. Ingram further concluded that Ezerski's complaints during the FCE "are extreme compared to the minimal changes noted on physical exam by her multiple physicians over the past 2-3 years.  It is difficult to explain these discrepancies except to state that there is less than full compliance with the exam, which undermines her credibility."  *Id.* at PageID##574-75.

Ingram found it quite significant that just *four days* prior to the FCE, which was performed on June 15, 2015, Ezerski had visited Dr. Verdon, who found that she had a normal gait, full strength, normal range of motion in her spine, normal flexion, and no tenderness.  She gave Dr. Verdon's observations as a surgeon

12

"much more weight than the physical therapist." *Id.* at PageID#570. She also noted that Ezerski's self-reported Oswestry disability index of 72% on that date was inconsistent with Dr. Verdon's "assessment of her condition and the benignity of her exam." *Id.* at PageID#571.

Likewise, Ingram noted that just *five days* prior to the FCE, Dr. Lauricella had examined Ezerski and found that she had normal range of motion. *Id.* Dr. Ingram concluded that Ezerski's records did not support a finding that she had limitations for full-time sedentary work after June 22, 2015. *Id.* at PageID#575.

Noting the obvious discrepancy between Dr. Verdon's June 11, 2015, office notes documenting Ezerski's normal neurologic examination, and his October 1, 2015, signature on the FCE, indicating his concurrence in Wickstrom's conclusion that Ezerski was totally disabled, Dr. Ingram contacted Dr. Verdon for clarification. She wanted to confirm whether he believed that Ezerski was incapable of performing sedentary-level work and, if so, on what basis. *Id.* at PageID#576.

Ingram's November 6, 2015, letter to Dr. Verdon documents their phone call. *Id.* at PageID##562-63. Dr. Verdon confirmed that Ezerski had no complications from the surgery, and has no difficulty walking. From a surgical standpoint, she was stable. When Dr. Ingram pointed out the inconsistencies in the FCE, Dr. Verdon agreed with her that the "probable explanation is that she was giving less than full effort." He stated that he "cannot provide objective evaluation for her difficulty to work, and rel[ies] on the FCE." He noted, however, that he had assumed that the goal of surgery was a return to work, and felt that Ezerski's

13

request for disability "came out of left field." *Id.* Dr. Ingram interpreted Dr. Verdon's statement to mean that the request was "not congruent with [his] assessment of her physical capabilities." *Id.* Dr. Verdon did not disagree with this interpretation. *Id.*

On January 7, 2016, Northwestern upheld its decision to terminate Ezerski's long-term disability benefits, Doc. #40-3, PageID##975-989. The 15-page decision cited all of the medical records that Ezerski had submitted for review, and contained a detailed discussion of Wickstrom's FCE. It also discussed Pinti's vocational opinion report, which the reviewer found to contain "no vocational analysis whatsoever." *Id.* at PageID#985. In addition, the decision recounted Dr. Shih's multiple reviews of Ezerski's claim file, Dr. Ingram's review and her discussion with Dr. Verdon. Northwestern's decision concluded as follows:

> The information in Ms. Ezerski's claim file documents that she ceased working as a Store Manager for Kirlin's Hallmark in March 2013 and has been primarily followed by Dr. Verdon and Dr. Lauricella. While Ms. Ezerski may require ongoing follow up for her various pain complaints, we are unable to reach a conclusion that she has been unable, as a result of Sickness or Injury, to perform with reasonable continuity the Material Duties of any gainful occupation.
>
> While we acknowledge that Ms. Ezerski may not be symptom-free, the medical information in her claim file does not support a degree of functional impairment as to preclude work activity, particularly non-physically demanding work activity.
>
> We are unable to accept the June 15, 2015 FCE as a valid measure of Ms. Ezerski's physical functional capabilities for the reasons outlined by Dr. Ingram, which are discussed above. This is further supported by PT Wickstrom's own observation that Ms. Ezerski exhibited unusual or inconsistent symptoms, superficial or non-anatomic

tenderness, inconsistent weakness or strength, and unusual behaviors or overreaction, which has now also been acknowledged by Dr. Verdon.

While we understand that Ms. Ezerski's emotional state on that date may have interfered with her FCE results, we are also unable to reach a conclusion that Ms. Ezerski has met the Definition of Disability on the basis of mental disorder.

In this regard, the information in Ms. Ezerski's claim file indicates that she has longstanding depression for which she takes Cymbalta. However, her disability has not been certified on the basis of mental disorder at any time from March 2013 to the present. Additionally, it does not appear that Ms. Ezerski has been referred to, or treated by, a mental health specialist due to any concerns about the status of her depression. If we are incorrect in this regard, please let us know.

In summary, we do not find that Ms. Ezerski has been unable, as a result of Sickness, Injury, or Pregnancy, to perform with reasonable continuity the Material Duties of any gainful occupation for which she is reasonably fitted by education, training, and experience. Therefore, the decision to close her LTD claim is correct and must be upheld.

*Id.* at PageID#988.

Ezerski timely filed suit under ERISA, 29 U.S.C. § 1132(a)(1)(B), seeking judicial review of Northwestern's termination of her long-term disability benefits. The parties have filed cross-motions for judgment on the administrative record, Docs. ##45, 46, and responses, Docs. ##50, 51.

II.  **Standard of Review**

Under ERISA, a participant or beneficiary of an employee welfare benefit plan may bring a civil action "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). "[A] denial of benefits challenged under § 1132

(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives

the administrator or fiduciary discretionary authority to determine eligibility for

benefits or to construe the terms of the plan," in which case the highly-deferential

"arbitrary and capricious" standard applies. *Firestone Tire & Rubber Co. v. Bruch*,

489 U.S. 101, 115 (1989).

Given that Northwestern's long-term disability plan contains no clear grant

of discretionary authority, the parties agree that the *de novo* standard applies

here.[1]  This requires the court to "take a fresh look at the administrative record."

*Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998)

(internal quotation omitted).  The court's role is "to determine whether the

administrator . . . made a correct decision." *Hoover v. Provident Life & Accident*

*Ins. Co.*, 290 F.3d 801, 808 (6th Cir. 2002) (quoting *Perry v. Simplicity Eng'g*,

900 F.2d 963, 965 (6th Cir. 1990)).  Under the *de novo* standard, Northwestern's

decision is entitled to no deference. *Id.* at 809.[2]  The question is whether

_____

[1]  Ezerski also notes that the policy was issued in Illinois, and that Illinois law
prevents the application of the arbitrary and capricious standard of review. *See* Ill.
Admin. Code § 2001.3.

[2]  Citing *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 111-12 (2008),
Ezerski asks the Court to consider the fact that, because Northwestern both
evaluates disability claims and pays them, it operated under a conflict of interest in
terminating her long-term disability benefits.  Northwestern correctly notes,
however, that such a conflict of interest is relevant only when reviewing a claim
under an "arbitrary and capricious" standard.  The purported bias of the plan
administrator or fiduciary has no place in a *de novo* review. *See Firestone Tire and
Rubber Co.*, 489 U.S. at 115 (noting that the *de novo* standard of review applies
"regardless of whether the administrator or fiduciary is operating under a possible
or actual conflict of interest"); *Sim v. Reliance Standard Life Ins. Co.*, No. 1:15-cv-

Northwestern properly interpreted the plan and whether Ezerski was entitled to continued long-term disability benefits under the plan.

## III.   Analysis

At issue is whether Ezerski has produced satisfactory proof that she is unable to perform with reasonable continuity the material duties of "any gainful occupation" for which she is reasonably fitted by education, training and experience. She maintains that: (1) her medical records and objective tests, including the EMG, MRI, CT myelogram and x-rays, support the claimed pathologies; and (2) the FCE provides reliable, objective evidence of the limitations caused by her disability. Accordingly, Ezerski asks the Court to order Northwestern to reinstate her long-term disability benefits. In the alternative, she asks the Court to vacate Northwestern's denial of benefits and remand the case for further review.

For the reasons set forth below, upon a *de novo* review of the administrative record, the Court concludes that Ezerski has failed to prove that she is entitled to continued long-term disability benefits under the terms of the Plan.

### A.   Objective Medical Evidence

There is no question that Ezerski has a well-documented history of chronic back and neck pain. As early as 2012, an MRI showed degenerative disc disease

---

390, 2016 WL 319868, at *1 n.1 (S.D. Ohio Jan. 26, 2016) ("alleged bias is irrelevant if the standard of review is *de novo*").

in her lumbar spine, at L2-L5.  Doc. #40-2, PageID#901.  Medical records from mid-2013 indicate that her back pain radiated into her legs, and she had tender sacroiliac joints.  Her straight leg raise was positive on the left and right, and she had an antalgic gait.  She was diagnosed with thoracic or lumbosacral neuritis or radiculitis, and given nerve blocks.  Doc. #40-2, PageID##888-889, 891, 893.

In 2014, Ezerski exhibited a decreased range of motion in her lumbar spine, *Id.* at PageID##815, and, in 2015, she was diagnosed with sacroiliitis, Doc. #40-4, PageID#1253.  A May 1, 2015, MRI of her lumbar region showed mild disc desiccation and bulging, and mild facet arthropathy, but there was no overt nerve root compression or disc herniation.  Doc. #40-4, PageID##1361-62.  An EMG showed no evidence of lumbar irregularities, but possible borderline sensory polyneuropathy with no evidence of plexopathy.  *Id.* at PageID#1251.

In addition to the problems with her lower back, Ezerski has also experienced problems with her neck.  In 2013, she was diagnosed with mild spondylosis and degenerative disc disease in her cervical spine, at C4-C7.  Doc. #40-2, PageID# 863.  An MRI done in 2014 showed moderate cervical spondylosis and central canal stenosis at C4-5.  Doc. #40-1, PageID#721.  A cervical myelogram showed effacement of the left lateral thecal sac at C4-5 and C5-6.  Doc. #40-2, PageID#784-85.  X-rays showed very minimal retrolisthesis of C4 upon C5 and mild anteroloisthesis of C7 upon T1.  *Id.* at PageID##778-79.  In December of 2014, Ezerski had cervical disc fusion surgery to address some of these problems.  Doc. #40-1, PageID##697-700.

In addition to her neck and lower back problems, Ezerski has been diagnosed with carpal tunnel syndrome. Doc. #40-2, PageID#894. She has complained of intermittent numbness and tingling in her hands. *Id.* at PageID#863. In 2015, she was also treated for tennis elbow. Doc. #40-5, PageID##1413-16.

## B. Unable to Perform with Reasonable Continuity the Material Duties of Any Occupation?

The question is whether, after June 22, 2015, any of these documented physical conditions rendered Ezerski unable to perform with reasonable continuity the material duties of any gainful occupation for which she is reasonably fitted by education, training and experience.[3] Ezerski bears the burden of proof on this issue. For the reasons set forth below, the Court finds that she has not satisfied that burden.

### 1. Reliability of Functional Capacity Evaluation ("FCE")

The outcome of this appeal hinges, in large part, on the appropriate weight to be given Rick Wickstrom's Functional Capacity Evaluation ("FCE"), conducted on June 15, 2015. As noted above, Wickstrom concluded that Ezerski is "extremely debilitated and would be unable to work on a sustained, full-time basis at any level of physical demands." Doc. #40-4, PageID#1242.

_____

[3] In addition to these documented physical problems, Ezerski has a documented history of depression and anxiety. In fact, in his FCE, Wickstrom concluded that "appropriate mental health care" should be her "first priority." Doc. #40-4, PageID#1242. Nevertheless, as Northwestern has noted, Ezerski has never claimed to be disabled on the basis of a mental disorder, and there is no indication that she has ever been referred to, or treated by, a mental health specialist. Doc. #40-3, PageID#988.

As a general rule, an FCE is considered to be a "'reliable and objective method' of gauging the extent one can complete work-related tasks." *Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 500 (6th Cir. 2008) (quoting *Cooper v. Life Ins. Co. of Am.*, 486 F.3d 157, 176 (6th Cir. 2007) (Sutton, J. concurring in part, dissenting in part)). Nevertheless, there are several reasons why an FCE may be rejected as fundamentally flawed.

In this case, as discussed below, Wickstrom specifically noted numerous performance concerns which cast doubt on Ezerski's credibility. More importantly, though, Wickstrom's conclusions are largely contradicted by the medical records of three separate treating physicians who examined Ezerski within days of the FCE. Accordingly, the Court finds that Northwestern properly concluded that the FCE does not provide reliable, objective evidence of Ezerski's true functional capabilities.

### a.   Performance Concerns

Wickstrom noted several "specific performance concerns" on the FCE, including "unusual or inconsistent symptoms," "superficial or non-anatomic tenderness," "inconsistent weakness or strength," "unusual behaviors or overreaction," and "increased baseline symptoms after exam." Doc. #40-4, PageID#1239. In fact, Wickstrom found that Ezerski's performance on 19 of the 22 tests performed was either "inconsistent" or "maybe inconsistent." *Id.* at PageID##1233-38. Wickstrom gave her an Overall Performance Rating of "medium low," and stated that the difficulties that she reported were "only partly

substantiated by objective findings." *Id.* at PageID#1239. He further noted that her Waddell screen was abnormal.[4] *Id.* at PageID#1231.

The Court rejects Ezerski's claim that these documented performance concerns affect the reliability of the FCE only with respect to tasks involving her upper extremities. Wickstrom also documented performance concerns related to tests involving her lower back and legs. For example, he noted inconsistencies on the horizontal pull test, and possible inconsistencies on the turning test, the horizontal push test, the usual walk and fast walk tests. *Id.* at PageID##1235-37.

In addition, Dr. Ingram explained that the fact that Ezerski's heart rate on the step test increased from a baseline of 72 beats per minute to just 90 beats per minute means that Ezerski did not give maximum effort; it was also inconsistent with Ezerski's reports of increased pain.[5] Doc. #40-1, PageID#569. When Dr. Ingram alerted Dr. Verdon to these numerous inconsistencies on the FCE, he agreed with her that the "probable explanation" was that Ezerski "was giving less than full effort." *Id.* at PageID##562-63.

Moreover, even though Wickstrom concluded that Ezerski's "prognosis is poor for return to her full range of previous duties as a retail manager at Kirlans [sic] Hallmark," and that she could not work at "on a sustained, full-time basis at

---

[4] A Waddell screen is a tool used to identify patients who may have a non-organic or psychological component to low back pain.

[5] Presumably, had Ezerski given maximum effort, or truly been experiencing increased pain during the test, her heart rate would have increased more significantly.

any level of physical demands," Doc. #40-4, PageID#1242 (emphasis added), this conclusion appears to be based, in some part, on his assessment of the significant impact of Ezerski's *mental health issues* on her ability to work. He noted that "[h]er poor physical functioning was likely impacted by co-existing mental health conditions," which he characterized as a "first priority." *Id.* However, as previously noted, Ezerski does not claim to be disabled based on any mental health disorders.

In short, the performance concerns documented by Wickstrom and the additional concerns identified by Dr. Ingram cast serious doubt on the reliability of the FCE test results and, in turn, on Wickstrom's conclusions concerning Ezerski's ability to work. The Court finds that the FCE does not provide reliable, objective evidence that Ezerski's physical ailments render her unable to meet the demands of a full-time sedentary-level job.

### b. Inconsistency with Contemporaneous Medical Records of Treating Physicians

There is another, more important, reason for rejecting the FCE as fundamentally flawed. Wickstrom's conclusion that Ezerski was "extremely debilitated" is largely inconsistent with the contemporaneous medical records of Ezerski's treating physicians.

The FCE was performed on June 15, 2015. Just *twelve* days earlier, on June 3, 2015, Dr. Pani Akuthota performed an electromyography (EMG) with nerve conduction test. This was in response to Ezerski's complaints of numbness

and tingling in her legs and feet.  His clinical findings on that date indicate that she had a normal gait pattern, and that heel and toe walking revealed "no weakness of extensor halluces longus or gastroc."  Her straight leg raise was negative and she had normal strength in both legs.  The EMG showed no evidence of lumbar radiculopathy, lumbosacral plexopathy, myopathy or motor neuron disease.  He concluded that she had "possible borderline sensory neuropathy" in her calf and suggested Neurontin for symptomatic relief.  Doc. #40-4, PageID#1364.

On June 10, 2015, just *five* days before the FCE, Ezerski visited Dr. Lauricella to review the results from her EMG and to discuss whether to try Neurontin or Lyrica to alleviate the pain in her legs.  At that visit, she complained of lumbar pain radiating into her legs, arthralgias, and a gait problem, and of weakness and numbness.  Nevertheless, on examination, Dr. Lauricella found that she had normal range of motion, normal strength and muscle tone, and a normal gait.  She had no sensory deficits.  *Id.* at PageID#1314.

Then, on June 11, 2015, just *four* days before the FCE, Ezerski visited Dr. Verdon, complaining of back pain.  He noted that her MRI showed multiple level lumbar spondylosis but with no overt nerve root compression or disc herniation, and the EMG showed "possible borderline polyneuropathy."  Office notes from his physical examination on that date indicate that she tested positive on the right side when he performed a straight leg raise, seated straight leg raise, well leg raise, shopping cart sign, and Faber/Patrick's test.  He diagnosed her with sacroiliitis and recommended medication and physical therapy.  *Id.* at PageID#1251.

Nevertheless, Dr. Verdon noted that Ezerski's neurological examination was normal, her motor strength was good, her sensation, reflexes and cerebellar function were intact, her posture and gait were normal. The range of motion of her cervical, thoracic, and lumbar spines was all within normal limits in flexion, extension, side bending, and rotation in all planes. She had no spinal deformity and no palpable tenderness of her spine or posterior superior iliac spine. *Id.* at PageID##1250-51.[6] Dr. Verdon also noted that Ezerski's concentration and attention span were within normal limits. *Id.* Notably, this finding is inconsistent with Ezerski's comment to Wickstrom, during the keyboard speed typing portion of the FCE, that it was "hard to concentrate." *Id.* at PageID#1234.

Ezerski returned for a follow-up visit with Dr. Lauricella on July 24, 2015, approximately *six weeks after* the FCE. Again, Ezerski complained of back pain, arthralgias, a gait problem, weakness and numbness. Nevertheless, Dr. Lauricella found that she had normal range of motion in her neck and elsewhere, and had normal strength and gait. At that visit, she indicated that medication was helping with her peripheral neuropathy. *Id.* at PageID##1318-20.

---

[6]  Ezerski notes that Wickstrom's finding of total disability is consistent with her Oswestry disability index score of 72%, as recorded in Dr. Verdon's June 11, 2015, office notes. Doc. #40-4, PageID#1250. As noted above, a score of 72 means that her "[b]ack pain has an impact on all aspects of daily living and work," and places her in the "crippled" category. *Id.* at PageID#1252. As Northwestern points out, however, an Oswestry score is not a physician's medical opinion, but is based on a patient's subjective self-assessment. Accordingly, it does not constitute an objective medical finding. *Bray v. Berryhill*, No. 1:16-cv-183, 2017 WL 3573819, at *3 (W.D. Ky. Aug. 17, 2017).

These medical records, from the treating physicians who examined Ezerski within days and weeks of her FCE, demonstrate that, although she suffered from some neuropathy in her legs and feet, and still had some pain in her lower back, she did not suffer from "severe loss of neck active range of motion," as Wickstrom had concluded in the FCE. Likewise, although Wickstrom found that Ezerski had "abnormal" lumbar flexion and extension, her treating physicians all found that she had normal range of motion, not only in her neck, but also in her back and hips. In short, Wickstrom's conclusion that Ezerski is "extremely debilitated" is largely inconsistent with the weight of contemporaneous medical evidence.

### 2. Mark Pinti's Report

In support of her claim, Ezerski also relies on rehabilitation consultant and vocational specialist Mark Pinti's three-page report, dated September 2, 2015. Doc. #40-5, PageID##1437-39. Pinti did not examine Ezerski. Rather, he reviewed Wickstrom's FCE, de Oliveira's Transferable Skills Assessment ("TSA"), Dr. Shih's April 15, 2015, report, and a summary provided by Ezerski's attorney.

In his report, Pinti discussed Wickstrom's findings, which were "based upon an actual clinical encounter and objective dynamic testing." *Id.* at PageID#1439. He summarily discounted Dr. Shih's findings based on the fact that Dr. Shih had never examined or treated Ezerski, and had not seen Wickstrom's FCE. Pinti also invalidated de Oliveira's TSA because it was based on the allegedly faulty assumption that Ezerski was capable of performing sedentary work.

Pinti concluded that, "[b]ased on Mrs. Ezerski's residual functional capacity, as determined by the FCE, she continues to be incapable of performing any of her past work. She does not retain transferable skills to sedentary work and is therefore totally disabled." *Id.* In Pinti's opinion, Ezerski's "residual functional capabilities are below sedentary level of exertion," rendering her "totally disabled" and unable to participate "in any work at any level of exertion." *Id.*

To the extent that Pinti summarily concurred with Wickstrom's FCE, which the Court has determined to be fatally flawed, and conducted no independent analysis of Ezerski's functional capabilities, the Court gives Pinti's report very little weight.

### 3. Assessment of Treating Physicians

An FCE is not the only objective evidence of a claimant's functional limitations. The assessments of the treating physicians are not given any special deference, but cannot be arbitrarily disregarded. *Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 548 (6th Cir. 2015). In this case, neither Dr. Lauricella nor Dr. Verdon appears to concur with Wickstrom's assessment of the extent of Ezerski's physical limitations.

The clinical findings of Dr. Lauricella are set forth above. In 2014, prior to Ezerski's neck surgery, he supported her request for long-term disability benefits, finding that she was unable to perform, with reasonable continuity, the material duties of her *own* occupation. However, there is no evidence that, after her

surgery, he believed that she was unable to perform, with reasonable continuity, the material duties of *any* occupation.

As previously noted, when Ezerski contacted Northwestern to protest the termination of her long-term disability benefits, she indicated that she would get a note from Dr. Lauricella saying that she was permanently disabled, Doc. #40-3, PageID#1038. However, no such note was ever submitted. Moreover, Wickstrom's FCE was originally printed with a signature block for Dr. Lauricella, who was asked to sign it if he agreed with it. Dr. Lauricella, however, never signed it. Doc. #40-4, PageID#1242.

Notably, the same week that the FCE was performed, Dr. Lauricella indicated that Ezerski reported back pain and leg pain; nevertheless, he found that she had a normal range of motion, normal strength, normal muscle tone and a normal gait. *Id.* at PageID#1314. Under these circumstances, it could be inferred that he refused to sign the FCE because he did not agree with Wickstrom's findings.

The week before Ezerski filed her appeal, the FCE was reprinted for Dr. Verdon's signature. He signed it on October 1, 2015. *Id.* at PageID#1244. As Northwestern points out, however, Dr. Verdon's signature cannot be deemed an unqualified endorsement of Wickstrom's opinion. Although the FCE report is eighteen pages long, Northwestern notes that it does not appear that Dr. Verdon was given the entire report. Rather, it appears that Ezerski's counsel faxed Dr.

Verdon a total of just three pages, which included the one-page summary with the block for his signature. *Id.*

As Northwestern notes, this one-page summary "omits crucial test data, including documentation that 19 of the 22 tests were 'Inconsistent' or 'Maybe Inconsistent,' [and] positive Waddell's signs."  Doc. #51, PageID#1673. Moreover, it says nothing of Wickstrom's assessment that Ezerski's physical limitations were "only partially substantiated by objective findings."  In addition, the summary omits Wickstrom's notations of her unusual behaviors, superficial or non-anatomic tenderness, and inconsistent weakness or strength.

As previously noted, Dr. Verdon's medical records from just four days before the FCE was performed indicate had Ezerski had sacroiliitis, but had full strength in each area tested, normal sensation and reflexes, a normal gait, normal posture, a normal range of motion in her cervical, thoracic and lumbar spines.  When pressed by Dr. Ingram to explain the apparent inconsistencies between his June 11, 2015, physical examination of Ezerski, and the results of the FCE just four days later, Dr. Verdon agreed that Ezerski had probably not given full effort on the FCE.  He stated that he was unable to provide "objective evaluation for her difficulty to work" and relied on the FCE.  Doc. #40-1, PageID#563.

Dr. Verdon admitted, however, that Ezerski's request for disability "came out of left field."  In her letter to Dr. Verdon, memorializing the substance of their phone call, Dr. Ingram said that she interpreted this to mean that he was surprised to receive the request, because he had assumed that Ezerski underwent surgery

with the goal of returning to work. She further interpreted this to mean that the request was "not congruent" with his assessment of Ezerski's physical capabilities. *Id.* Although Dr. Ingram gave Dr. Verdon the opportunity to make changes, additions or corrections to her interpretation of the contents of their phone call, he made none. *Id.*

Under these circumstances, the fact that Dr. Verdon's signature appears on the FCE can hardly be deemed a ringing endorsement of Ezerski's request for long-term disability benefits.

### 4. Assessment of Reviewing Physicians

Northwestern hired two physicians to review Ezerski's medical records. As noted above, Dr. Mark Shih, who is board-certified in physical medicine and rehabilitation, reviewed Ezerski's records on three occasions. In his final report, dated April 15, 2015, Dr. Shih found that Ezerski "is capable of sedentary work activities on a full-time basis with 10 pounds occasional lifting, carrying, pushing, and pulling, with frequent sitting, standing, and walking, and may ultimately improve to a potential light-level capacity." Doc. #40-1, PageID#633.

Dr. Shirley Ingram, who is board certified in rheumatology and internal medicine, reviewed Ezerski's records on appeal. She likewise concluded that Ezerski was not precluded from full time sedentary work after June 22, 2015. In reviewing the medical records, she found that "[t]he stated limitations in her complaints are disproportionate to any abnormalities on finding or imaging studies." Ingram found that the FCE contained "significant inconsistencies" that

invalidated the results. She noted that Wickstrom found that Ezerski had almost normal range of motion of the cervical spine for lateral rotation. *Id.* at PageID#575. Citing the inconsistencies between Dr. Verdon's medical records and the flawed FCE, Dr. Ingram determined that Dr. Verdon's clinical observations should be given "much more weight" than the FCE. *Id.* at PageID#570.

Ezerski raises several arguments with respect to the reports of these reviewing physicians and Northwestern's reliance on them. She first challenges Dr. Ingram's qualifications. Regulations governing appeals of adverse benefit determinations require plan fiduciaries to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 20 C.F.R. § 2560.503-(1)(h)(3)(iii). *See also Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610-11 (6th Cir. 2016) (noting that the fiduciary must "consult with medical professionals with relevant expertise.").

Ezerski argues that Dr. Ingram is not qualified to assess physical limitations resulting from musculoskeletal disorders and spinal pathology. Ezerski has alleged, however, that she is disabled due to "degenerative disc disease of the lumbar spine; sciatica; arthritis in knees and hands; and bilateral carpal tunnel syndrome." Doc. #40-4, PageID#1216. Arthritis, chronic joint pain, and carpal tunnel syndrome fall squarely within the expertise of a rheumatologist. Although degenerative disc disease and sciatica may typically be treated by other specialists, nothing in Dr. Ingram's report suggests that she was not qualified to review the

objective evidence to assess whether these medical conditions would prevent Ezerski from working a full-time sedentary-level job.

Moreover, when Northwestern referred the file to Dr. Ingram, it instructed her that "[i]f you feel a file review by another medical specialist is warranted, please so indicate. Additionally, if you feel it would be helpful to contact any of Ms. Ezerski's treatment providers for clarification or additional information, please do so." Doc. #40-1, PageID#592. In her report, Dr. Ingram did not indicate that any review by a different medical specialist was warranted. She did, however, contact Dr. Verdon, Ezerski's treating neurologist, for help "in further understanding Ms. Ezerski's physical condition and capabilities" and to clarify the discrepancies between the FCE and his office notes from that same week. *Id.* at PageID##563, 576.

Even assuming *arguendo* that Dr. Ingram was not fully qualified to assess the impact of Ezerski's spinal pathology and musculoskeletal disorders on her ability to work, the Court notes that Dr. Ingram's conclusions are fully consistent with those of Dr. Shih, whose qualifications Ezerski has not challenged.

Ezerski next argues that, because the FCE was the only comprehensive, objective, reliable evidence of her specific work capabilities, and it was signed by her treating physician, Dr. Verdon, it was improper for Northwestern to invalidate the FCE in favor of its non-examining file reviewer, Dr. Ingram. She maintains that, if Dr. Ingram disagreed with Wickstrom's assessment on the FCE, she should have contacted him for further explanation. She further argues that, if

Northwestern disagreed with Wickstrom's assessment, it should have obtained an independent FCE or order an independent medical examination, as authorized by the Plan.  Doc. #40-3, PageID##1168-69.

Ezerski cites to several cases in which courts have found that a plan administrator's reliance on a file-only review may "raise questions about the thoroughness and accuracy of the benefits determination."  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005).  Nevertheless, there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination."  *Id.* at 296.

A file review will pass muster if it is thorough and the file reviewer adequately explains the basis for his or her opinion.  However, if the file reviewer fails to do so, or makes adverse credibility determinations that are contrary to the clinical findings of the claimant's treating physicians, a plan administrator's reliance on such a file review may be problematic.  *Id.*  This is particularly true when the plan administrator has the authority to order an independent medical examination.  *See, e.g., Smith v. Continental Cas. Co.*, 450 F.3d 253, 263-64 (6th Cir. 2006); *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 550 (6th Cir. 2015); *Evans v. Unum Provident Corp.*, 434 F.3d 866, 878 (6th Cir. 2006).

These cases, however, are factually distinguishable.  Here, Dr. Ingram thoroughly explained why the FCE should be invalidated.  Not only did Wickstrom document numerous performance concerns, but his final assessment of Ezerski's functional capabilities was inconsistent with the contemporaneous medical records

of three physicians who examined her within days of the FCE. Moreover, there is no evidence that Dr. Ingram's conclusions concerning Ezerski's ability to work are inconsistent with those of Ezerski's treating physicians. Dr. Lauricella did not sign the FCE and, although Dr. Verdon did sign it, he did not disagree with Dr. Ingram's statement that Ezerski's request for disability benefits was incongruent with his assessment of her true physical capabilities.

Moreover, both Dr. Shih and Dr. Ingram reviewed Ezerski's medical records at length. Both acknowledged her reports of chronic neck and back pain, but found that her claimed limitations were disproportionate to the objective medical evidence. Although Dr. Ingram did make a credibility assessment in rejecting the FCE, it was based on Wickstrom's own documentation of his concerns about Ezerski's performance, on objective medical evidence, and a follow-up call with Ezerski's treating neurosurgeon, Dr. Verdon. Under these circumstances, neither an independent medical examination nor an independent FCE would be likely to yield different results.

Ezerski also argues that neither the reviewing physicians nor Northwestern specifically analyzed the policy requirement that she be able to perform the Material Duties of any occupation "with reasonable continuity." Neither Dr. Shih's report nor Dr. Ingram's report mentions this specific term, and there is no indication that Dr. Ingram discussed with Dr. Verdon whether Ezerski could perform the material duties of any occupation "with reasonable continuity." Northwestern's letter, upholding the decision to terminate long-term disability

33

benefits, concludes that Ezerski failed to show that she is "unable, as a result of Sickness, Injury, or Pregnancy, to perform with reasonable continuity the Material Duties of any gainful occupation for which she is reasonably fitted by education, training, and experience." Doc. #40-3, PageID#988. Again, however, there is no discussion of what it means to be able to perform material duties "with reasonable continuity."

The term "with reasonable continuity" is not defined in the policy itself. Ezerski argues that, under the doctrine of *contra proferentum*,[7] the "ordinary meaning" of the term must be applied. She maintains that a worker should be deemed unable to perform her duties "with reasonable continuity" if her disability would require her to take excessive breaks, have frequent absences, or be off task excessively. Doc. #46, PageID#1628.

Nothing in Ezerski's medical records, however, supports a finding that she would require *excessive* breaks or frequent absences. Her FCE states that she can sit, stand and walk for no more than two hours at a time. Doc. #40-4, PageID#1242. Similar restrictions were noted by Dr. Shih, Doc. #40-2, PageID##790-91, and Dr. Ingram, Doc. #40-3, PageID##573, 575 (noting "[t]here are no limitations for sitting up to 8 hours per workday with reasonable breaks.").

_____

[7] "The *contra proferentum* rule is applied where contractual language is found to have more than one interpretation. If the language is subject to more than one interpretation, ambiguities are construed against the drafter of the language." *Marquette Gen. Hosp. v. Goodman Forest Indus.*, 315 F.3d 629, 632 n.1 (6th Cir. 2003).

The Transferable Skills Assessment was based on the assumption that Ezerski
would have to change positions "from sitting to standing on an as needed basis."
*Id.* at PageID#1111. In addition, there is no objective medical evidence to support
Ezerski's claimed lack of concentration or inability to stay on task.

Although Dr. Shih and Dr. Ingram's reports fail to make a specific finding
that Ezerski is able to perform "with reasonable continuity" the material duties of
any occupation, they do state that she has no functional limitations that would
prevent her from performing "full-time" sedentary work. Doc. #40-1,
PageID##575, 633. Implicit in that statement the doctors' opinion that she would
be able to perform her duties "with reasonable continuity."

For these reasons, the Court rejects Ezerski's challenges to Northwestern's
reliance on the file reviews of Dr. Ingram and Dr. Shih.

### 5.    Transferable Skills Assessment

Ms. de Oliviera's Transferable Skills Assessment ("TSA") was conducted in
November of 2014, before Ezerski's neck surgery. Her task was to assess
Ezerski's ability to perform "any occupation" given Ezerski's "documented
functional capacity, work history, education, training, experience, transferable
skills and labor market analysis." Doc. #40-3, PageID#1107. At that time,
Ezerski's "documented functional capacity" precluded her "from light level work
and above" and she needed a job that would allow her to alternate between sitting
and standing as needed. *Id.* at PageID#1111.

To the extent that the Transferable Skills Assessment was based on the assumption that Ezerski was, in fact, capable of full-time sedentary work, it sheds little light on the ultimate question in this case. It simply supports a finding that, assuming that she is capable of working in a sedentary job, there are jobs for which she is qualified.

### 6.    Social Security Determination

The Court's conclusion, that Ezerski failed to demonstrate that, as a result of her medical conditions, she was "unable to perform with reasonable continuity, the Material Duties of any gainful occupation for which [she is] reasonably fitted by education, training and experience," is also consistent with the Social Security Administration's ("SSA's") determination that Ezerski is not disabled. Although the agency's decision is not binding on the Court, it may be considered in evaluating a disability claim. *See, e.g., Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008) (finding that a file reviewer's failure to explain why it disagreed with the SSA's determination that the claimant was disabled "raises serious questions about the thoroughness and accuracy" of the file review).

### 7.    Summary

As Northwestern has acknowledged, Ezerski has chronic pain and ongoing health issues which limit the amount of time she can continuously sit, stand, or walk. Nevertheless, Ezerski has failed to prove that she is unable to perform with reasonable continuity the material duties of any gainful occupation for which she is reasonably qualified.

36

For the reasons stated above, Wickstrom's FCE is entitled to little weight. Not only is it internally inconsistent but, more importantly, it is also inconsistent with the contemporaneous medical records of Ezerski's treating physicians, Dr. Lauricella and Dr. Verdon. Although Dr. Verdon signed the FCE, he later agreed with Dr. Ingram that it was very likely that Ezerski had not given full effort, and that Ezerski's request for long-term disability benefits was "not congruent" with his assessment of Ezerski's physical capabilities. Doc. #40-1, PageID##562-63.

In short, neither the medical records of Ezerski's treating physicians nor the reports of reviewing physicians Dr. Shih and Dr. Ingram support a finding that Ezerski is incapable of full-time, sedentary work. As Dr. Ingram noted, Ezerski's subjective complaints are disproportionate to any clinical findings.

Ezerski has failed to prove that she is unable to perform with reasonable continuity the material duties of any occupation for which she is reasonably qualified. Accordingly, the Court finds that Northwestern properly determined that Ezerski is no longer eligible for long-term disability benefits.

## C.    Attorney Fees

Northwestern also asks for an award of costs and reasonable attorney fees. ERISA permits, but does not require, the Court to award such costs and fees to either party. 29 U.S.C. § 1132(g)(1). Five factors may be considered, but are not dispositive:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar

circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*First Trust Corp. v. Bryant*, 410 F.3d 842, 851 (6th Cir. 2005) (quoting *Foltice v. Guardsman Prods., Inc.*, 98 F.3d 933, 936-37 (6th Cir. 1996)).

There is no indication that Ezerski filed this action in bad faith and, given her documented history of physical problems, her claim is certainly not frivolous. Accordingly, an award of fees and costs would have little or no deterrent effect on similarly-situated claimants. More importantly, however, given that Ezerski is not working, any award likely would constitute a severe financial hardship on her and her family. For these reasons, the Court denies Northwestern's request for attorney fees and costs.

## IV. Conclusion

Therese Ezerski has failed to prove by a preponderance of the evidence that she is unable to perform, with reasonable continuity, the material duties of any gainful occupation for which she is reasonably qualified. Accordingly, the Court SUSTAINS Northwestern's Motion for Judgment on the Administrative Record, Doc. #45, and OVERRULES Plaintiff's Corrected Motion for Judgment on the Administrative Record, Doc. #46.

Judgment shall be entered in favor of Defendant and against Plaintiff.

The captioned case is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: July 9, 2018

WALTER H. RICE
UNITED STATES DISTRICT JUDGE